In 1980, Glen Strickland, W.G. Rahaim, and Don Sharp entered into the following contract: *Page 59 
"STATE OF ALABAMA
"FRANKLIN COUNTY
"RECIPROCAL FIRST REFUSAL OPTION
 "This agreement is made by and among Glen Strickland, Russellville, Alabama, W.G. Rahaim, Sheffield, Alabama, and Don Sharp, Tuscumbia, Alabama, who are the controlling stockholders of Tri Cities Manufacturing and Engineering, Inc. and Tri Cities Sales Corporation, Inc., corporations organized under the laws of the State of Alabama.
 "The parties hereto deem it in their interest and in the interest of the corporations that the voting shares held by them not be transferred to or held by any party who is not interested in the conduct of the business of the corporations.
 "NOW, THEREFORE, for the above reason, and in consideration of the mutual covenants and reciprocal options granted, the parties hereto do hereby agree as follows:
 "The undersigned parties hereby grant to each other the right, option and privilege of purchasing all or any part of the voting shares held, for any price, and upon any terms and conditions at which either party hereto desires to sell such stock to someone other than the undersigned. Each of the undersigned agrees to forward by registered mail to the parties hereto, at their last known address, notice in writing of any offer for purchase of voting shares which he wishes to accept, together with a copy of the offer or an exact report of the details thereof and the name and address of the offeror; and each party hereto further agrees that he will not sell, transfer, assign, hypothecate or otherwise alienate any of his voting shares until he has complied with the requirements of this provision and the parties hereto have refused or failed to purchase said voting shares by the date set for the proposed transfer; provided, however that if notice of the proposed transfer is delivered to the parties hereto less than thirty (30) days prior to the date set for the proposed transfer, such option period shall terminate thirty (30) days from the date of such delivery and such voting shares may not be transferred to the proposed transferee until after thirty (30) days from the date of such delivery.
 "This agreement contains the entire understanding between the parties hereto concerning the subject matter contained herein. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto, relating to the subject matter of this agreement, which are not fully expressed herein."
At the time this contract was executed, Strickland, Rahaim, and Sharp were directors of Tri-Cities Manufacturing and Engineering, Inc., and Tri-Cities Sales Corporation, Inc. (both referred to hereinafter as "Tri-Cities"). Rahaim also served as president of Tri-Cities.
In 1987, Rahaim received the following offer from his son, Charles Rahaim, who, at that time, was an officer, director, and stockholder of Tri-Cities:
"Dear Dad:
 "After a lot of thought about it, I have decided that I would like to purchase your stock in Tri-Cities.
 "I am offering you $4.50 a share (total $268,654.50), payable $50,000 and the balance at 8% over five years.
 "I know your stock is subject to a right of first refusal with Glen and Don. Therefore, please give them notice as soon as possible inasmuch as I would like to complete the purchase on June 10, 1987. Also, I will need this time to secure suitable financing.
 "Please let me know your response to this offer as soon as you can from Don and Glen."
Rahaim immediately mailed the following letter to Strickland:
"Dear Glen:
 "I have received the enclosed offer from Chuck to buy my stock in Tri-Cities. Subject to our right of first refusal, I am going to accept this offer and retire from the company. Please let me *Page 60 
know if you want to purchase my stock under the same terms within the next 30 days.
 "Please call me if you have any questions about the offer."
Shortly thereafter, Rahaim received the following letter from Strickland:
"Dear Bill:
 "I hereby accept your offer to purchase your 59,701 shares of stock in Tri-Cities Manufacturing, Inc. for 268,654.50, payable 50,000.00 and the balance at 8% over five years as per your offer dated May 4, 1987 (received on May 7, 1987) and in accordance with the terms of our reciprocal first refusal option dated July 18, 1980.
 "Please let me know when we may close the transaction."
Rahaim later decided that he did not want to retire, declined his son's offer, and refused to sell his stock to Strickland.
Strickland filed suit against Rahaim, seeking specific performance of the contract that, he says, came into existence when he accepted Rahaim's offer to sell his stock. The trial court, after hearing ore tenus evidence, denied Strickland's request for specific performance. Strickland appealed; we affirm.
At this point we should note that when a trial court has heard ore tenus evidence, as in this case, its judgment based upon that evidence is presumed correct and will be reversed only if, after consideration of the evidence and all reasonable inferences to be drawn therefrom, the judgment is found to be plainly and palpably wrong. Furthermore, when a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Robinson v. Hamilton, 496 So.2d 8 (Ala. 1986).
The trial court ruled, inter alia, that the language of the 1980 contract was ambiguous, and allowed Rahaim to introduce parol evidence to explain the intent of the parties. The judgment of the trial court reads, in pertinent part, as follows:
 "12. The Court further finds that the Reciprocal First Refusal Option Agreement was not intended to apply and does not apply to an offer from someone like Charles T. Rahaim, who was also an officer, director and shareholder of Tri-Cities Manufacturing, Inc. and who was and is involved daily with the operation of the corporation, in other words, a party who is interested in the conduct of the business of the corporation."
Implicit in the trial court's judgment were findings either that Rahaim mistakenly believed that he was obligated under the 1980 contract to offer his stock to Strickland, that Strickland was aware of that mistake, and that, under the circumstances, it would be inequitable to require Rahaim to sell his stock to Strickland, or that Rahaim and Strickland, acting under a mutual mistake, believed that the 1980 contract required the offer to be made.
Strickland contends that the trial court erred in its determination that the language of the 1980 contract was ambiguous and, therefore, that it erred in allowing Rahaim to introduce parol evidence. He argues that the 1980 contract clearly required Rahaim to make the offer that he did, and that once that offer was accepted an enforceable contract was formed. We disagree.
The construction of a written instrument is a function of the court. Whether a contract is ambiguous is a question of law for the trial court. When its terms are clear and certain, the court has the duty to determine the meaning of the agreement. In order to ascertain the intention of the parties, the clear and plain meaning of the terms of the contract are to be given effect, and the parties are presumed to have intended what the terms clearly state. Extrinsic evidence may be admitted to interpret a contract only if the court finds that the contract is ambiguous. Terry Cove North v. Baldwin Co. Sewer Authority,Inc., 480 So.2d 1171 (Ala. 1985).
We hold that the trial court correctly concluded as a matter of law that the language of the 1980 contract was ambiguous. That contract, as written, required *Page 61 
Rahaim to offer his stock to Strickland and Sharp prior to accepting an offer from "someone other than the undersigned." The trial court construed that phrase as being modified by the second and third paragraphs of the contract, which stated that the purpose of the agreement was to prevent the transfer of stock in Tri-Cities to a party "not interested in the conduct of the business of the corporations." Thus, the trial court, giving effect to the plain meaning of the contract's terms, construed it as requiring Rahaim to offer his stock to Strickland and Sharp prior to accepting an offer from "someone other than the undersigned" who was "not interested in the conduct of the business of the corporations." On its face, this requirement was clear enough; however, a question arose as to whether Charles Rahaim fell within the category of someone "not interested in the conduct of the business of the corporations." The evidence revealed that Charles Rahaim was a director, officer, and stockholder of Tri-Cities and, therefore, that he would ordinarily be thought of as someone "interested in the conduct of the business of the corporations." However, Rahaim asserted, and the evidence tended to show, that the primary purpose of the 1980 agreement was to prevent the transfer of any stock to Frank Caseglia, another director and stockholder of Tri-Cities, with whom Strickland, Rahaim, and Sharp had major differences of opinion with regard to the manner in which the corporations were to be managed. The trial court did not err in admitting parol evidence to explain what was intended in 1980 when the language "not interested in the conduct of the business of the corporations" was inserted into the contract. See, also, Mass. Appraisal Services, Inc. v. Carmichael,404 So.2d 666, 672-73 (Ala. 1981) (discussing the "latent ambiguity" exception to the parol evidence rule). Furthermore, the trial court's finding that the 1980 contract did not require Rahaim to offer his stock to Strickland was not plainly and palpably wrong.
As previously stated, implicit in the trial court's judgment were findings that either Rahaim mistakenly believed that he was obligated under the 1980 contract to offer to sell his stock to Strickland, that Strickland was aware of that mistake, and that under the circumstances, it would be inequitable to require Rahaim to sell his stock to Strickland, or that Rahaim and Strickland, acting under a mutual mistake, believed that the 1980 contract required the offer to be made. Neither of these findings of fact would be clearly erroneous. InMontgomery v. Strickland, 384 So.2d 1085 (Ala. 1980), the trial court granted the Stricklands' prayer for specific performance of a contract in which they agreed to purchase a tract of land from the Montgomerys. The Montgomerys claimed that the contract was entered into by them while under the mistaken impression that the tract contained 21 acres of land when, in fact, there was approximately 35 acres in the subject tract. In affirming the trial court's judgment, this Court noted:
 "The Montgomerys correctly argue that the controlling rule is that as stated in Board of Water and Sewer Commissioners of the City of Mobile v. Spriggs, 274 Ala. 155, 146 So.2d 872 (1962):
 " 'The equity of the instant bill is rested on the principle which has been referred to by this court as follows:
 " ' "If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected when it is discovered, he cannot under these conditions claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract. 6 R.C.L. page 623, section 42; 12 Amer. Jur. 624, section 133, and cases there cited." Ex parte Perusini Const. Co., 242 Ala. 632, 636, 7 So.2d 576, 578.'
 "This Court went on to cite with approval the generally recognized rule that ' "[t]he mistake must be so grave a consequence *Page 62 
that to enforce the contract as actually made would be unconscionable." ' 274 Ala. at 160, 146 So.2d at 876."
384 So.2d at 1086-87. The rule stated in Montgomery v.Strickland, supra, would be applicable in the present case.
Likewise, in Glenn v. City of Birmingham, 223 Ala. 501,502-03, 137 So. 292, 293 (1931), the Court, discussing the remedy of rescission of a contract on the ground of mutual mistake, stated as follows:
 " 'It is . . . freely and frequently granted where there is a mistake of both parties as to a collateral matter which constitutes the very basis of the contract, and the inducement to its formation.' "
(Quoting Vol. 5, Pomeroy's Eq. Jur. § 2106.) The rule stated inGlenn v. City of Birmingham would also be applicable here.
In addition, the trial court made the following finding:
 "The Court further finds there was no meeting of the minds between W.G. Rahaim and Glen Strickland sufficient to establish a contract for the sale and purchase of stock. The July 1 reply of Glen Strickland to the May 4 letter of W.G. Rahaim contained no mention of suitable financing, which was a material element in the purchase of stock from W.G. Rahaim; suitable financing, according to the testimony offered, referred to the removal or substitution of W.G. Rahaim's name as a personal guarantor on [approximately $600,000 of] the corporate debt. Also, the reference to suitable financing was contained in the letter offer of Charles T. Rahaim yet was not addressed in the June 1 reply letter [of] Glen Strickland, therefore, there was simply no acceptance."
The trial court did not err in admitting parol evidence to explain what Rahaim's son meant when he stated in his letter that he needed time "to secure suitable financing."
 "Where the offerer, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract. It has been stated that the parties in such a case have 'said different things.' Thus, where, after the parties have apparently agreed to the terms of a contract, circumstances disclosed a latent ambiguity in the meaning of an essential word by which one of the parties meant one thing and the other a different thing, the difference going to the essence of the supposed contract, the result is that there is no contract. Where there is such a misunderstanding as to the terms of a contract, neither party is obligated in law or equity."
17 Am.Jur.2d Contracts § 22 (1964).
After a careful review of the record, we cannot hold that the trial court, sitting in equity, abused its discretion in denying Strickland's request for specific performance.Montgomery v. Strickland, supra.
For the foregoing reasons, the judgment appealed from is due to be affirmed; therefore, we pretermit a discussion of any other grounds assigned by the trial court in support of its judgment denying specific performance.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.