Rel: December 22, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

———————————————

### SC-2023-0092
———————————————

**Great American Insurance Company**

**v.**

**Crystal Shores Owners Association, Inc.**

**Appeal from Baldwin Circuit Court
(CV-21-900497)**

PER CURIAM.

Great American Insurance Company ("Great American") appeals from the Baldwin Circuit Court's order denying its motion to invoke the appraisal procedure contained in a commercial-property insurance policy

Great American issued to Crystal Shores Owners Association, Inc. ("Crystal Shores"), concerning the Crystal Shores Condominium complex ("the property") located on West Beach Boulevard in Gulf Shores. We dismiss the appeal.

## I. Facts

According to Crystal Shores' complaint, on September 30, 2019, RSUI Indemnity Company ("RSUI") and Landmark American Insurance Company ("Landmark") issued a commercial-property insurance policy to Crystal Shores for a period of one year from the date of issuance.[1] On the same date, the complaint alleged, Great American issued a commercial-property insurance policy to Crystal Shores for a period of one year from the date of issuance.[2]

On September 16, 2020, Hurricane Sally made landfall on the Alabama Gulf Coast. Crystal Shores' complaint alleged that Hurricane

---

[1]In its answer to Crystal Shores' complaint, RSUI agreed that Landmark had issued a commercial-property insurance policy to Crystal Shores, but it denied that RSUI was a party to the Landmark insurance policy. That dispute is not before us in this appeal.

[2]The Great American insurance policy listed "Crystal Shores Condominium" as the "Named Insured," but there appears to be no dispute that "Crystal Shores Owners Association, Inc.," is the holder of the policy.

Sally caused "substantial damages to the Crystal Shores Condominium." According to its complaint, Crystal Shores "timely and properly reported its Hurricane Sally claim to the Third-Party Defendants [Great American, RSUI, and Landmark] for damage to [the property] sustained as a result of the storm event."

Crystal Shores alleged that the main water line to the property had been turned off in preparation for the imminent landfall of Hurricane Sally. However, the owner of Unit 606 had left on the faucet to the bathtub in that unit before vacating the premises because of the hurricane emergency. After Hurricane Sally had passed, the water flow was restored to the property, and the faucet in Unit 606 ran for over 24 hours before it was discovered by persons returning to the property. Crystal Shores alleged that the constant running of water in the bathtub of Unit 606 resulted in an overflow of water that flooded an entire stack of condominium units. Crystal Shores alleged that it "timely submitted the Unit 606 tub overflow claim to third-party defendants RSUI, Landmark, Great American [and fictitiously named defendants] seeking coverage to mitigate and remediate the damage resulting from this covered loss."

According to Crystal Shores' complaint, it

"retained Bowen Wilson, Inc., d/b/a Servpro of Montgomery to mitigate and remediate damage caused by Hurricane Sally as well as the Unit 606 tub overflow claim. Crystal Shores timely submitted to Third-Party Defendants all invoicing and supporting documentation provided by Servpro pertaining to mitigation and remediation scopes of work performed by Servpro to mitigate and repair damage caused by Hurricane Sally and the Unit 606 tub overflow claim.

"27. However, third-party defendants RSUI, Landmark, Great American, and [fictitiously named defendants] have failed to fully compensate [Crystal Shores] for the Unit 606 tub overflow claim and have further refused to compensate [Crystal Shores] for services allegedly rendered by Servpro to mitigate and remediate damage caused by both Hurricane Sally and the Unit 606 tub overflow."

On May 6, 2021, Bowen-Wilson, Inc., d/b/a Servpro of Montgomery ("Servpro"), commenced an action in the Baldwin Circuit Court by filing a complaint against Crystal Shores. In that complaint, Servpro alleged that Crystal Shores had not fully compensated Servpro for the mitigation and construction work Servpro had performed on the property pursuant to a contract between Servpro and Crystal Shores. On June 11, 2021, Crystal Shores filed an answer and counterclaim in response to Servpro's complaint.

On June 24, 2022, Crystal Shores filed in the Baldwin Circuit Court a "Motion for Relief to File Third-Party Complaint" in which Crystal

Shores alleged that one reason it had not fully paid Servpro's invoices was that

> "Third-Party Defendants RSUI, Landmark and Great American refused to compensate [Crystal Shores] for all invoices [Crystal Shores] received from Servpro pertaining to the scopes of work allegedly performed by Servpro pertaining to both losses [the Hurricane Sally loss and the Unit 606 tub-overflow claim]. Accordingly, [Crystal Shores] was unable to fully compensate Servpro for services allegedly rendered mitigating and remediating the losses."

Crystal Shores thus sought leave to file a third-party complaint against RSUI, Landmark, and Great American "[s]o that this case can be fully and fairly litigated." On July 8, 2022, the circuit court granted Crystal Shores' motion.

On July 28, 2022, Crystal Shores filed a third-party complaint against RSUI, Landmark, Great American, and fictitiously named defendants. As we already have noted, Crystal Shores' complaint alleged that it filed insurance claims for damage to the property stemming from both Hurricane Sally and the Unit 606 bathtub overflow. In addition to the allegations we already have detailed, Crystal Shores' complaint asserted:

> "30. Third-Party Plaintiff Crystal Shores has incurred significant costs mitigating interior damage, replacing the roof and repairing exterior damage, as well as other damage

5

the building sustained as a result of Hurricane Sally and the unit 606 tub overflow, all of which has been timely and properly reported to the third-party Defendants.

"31. However, third-party Defendants RSUI, Landmark, Great American and [fictitiously named defendants] have failed to promptly and/or properly investigate [Crystal Shores'] losses.

"32. Defendants RSUI, Landmark, Great American and [fictitiously named defendants] have further failed to timely and/or properly compensate Crystal Shores for losses sustained as a result of Hurricane Sally and the unit 606 tub overflow.

"33. Defendants RSUI, Landmark, Great American and [fictitiously named defendants] have further failed to submit [Crystal Shores'] claims to a cognitive evaluation or review and have breached the insuring agreements and committed bad faith by refusing to compensate [Crystal Shores] for damage the building and units sustained as a result of Hurricane Sally and the unit 606 tub overflow."

Count I of Crystal Shores' complaint asserted against Great American and the other third-party defendants bad-faith claims: failure to pay insurance proceeds and failure to investigate. That count included the allegation that Great American and the other third-party defendants had "intentionally and/or recklessly failed to timely and/or properly investigate and/or pay [Crystal Shores'] claim for damages sustained as a result of the storm event and the Unit 606 tub overflow." Count II of Crystal Shores' complaint asserted claims against Great American and

6

the other third-party defendants alleging breach of "the terms and conditions of the insurance policies … by failing to timely and properly investigate and pay [Crystal Shores] for losses sustained as a result of the storm event and the Unit 606 tub overflow, said losses occurring during the policy periods." Crystal Shores attached copies of the insurance policies -- including a copy of the commercial-property insurance policy issued by Great American -- to its complaint.

On September 30, 2022, Great American filed in the circuit court a "Motion to Dismiss, or in the Alternative to Stay and Compel Compliance with the Appraisal Procedure Specified in the Policy." In that motion, Great American argued that the parties' dispute about the amount of the loss suffered by Crystal Shores was subject to an appraisal procedure described in the insurance policy. Specifically, the appraisal clause in the Great American insurance policy provided:

"**B. Appraisal**

"If [Great American] and [Crystal Shores] disagree on the value of the property, the amount of Net Income and operating expenses, or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the

7

value of the property, the amount of Net Income and operating expenses, or the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

"1. pay its chosen appraiser; and

"2. bear the other expenses of the appraisal and umpire equally.

"If there is an appraisal, [Great American] will still retain [its] right to deny the claim.

"Neither the appraisers nor the umpire shall attempt to resolve any issue of insurance coverage, policy exclusions, compliance with the Policy terms and conditions, or any issues concerning the Limits of Insurance available under the Policy."

(Bold typeface in original.) In its motion, Great American also noted that

a previous section of the insurance policy provided:

**"SELECT BUSINESS POLICY CONDITIONS**

"This Coverage Part is subject to the following conditions.

"**General Conditions**

"….

"**D. Legal Action Against Us**

"No one may bring a legal action against [Great American] under this Coverage Part unless:

"1. there has been full compliance with all of the terms of this Coverage Part; and

"2. the action is brought within 2 years after the date on which the direct physical loss or damage occurred."

(Bold typeface in original.)

In its September 30, 2022, motion, Great American asserted:

"8. The individual appraisal process mandated by the Great American Policy fully encompasses the claims set forth against Great American in the Third-Party Complaint, and Crystal Shores' compliance with it will establish the amount of loss associated with the claims made under the Great American Policy for damages sustained by the Property. Crystal Shores does not contend that it has complied with the appraisal provision."

Because, according to Great American, "the appraisal provision in the Great American Policy is mandatory once invoked," and because "[t]he appraisal, once conducted, will resolve this controversy in its entirety, since all claims in this action hinge upon the determination of the amount of the 'loss' sustained by the Property," Great American contended that the appraisal clause was a written arbitration agreement pursuant to the Federal Arbitration Act ("the FAA"), 9 USC § 1 et seq. Great American therefore requested that the circuit court dismiss Crystal Shores' claims against it or stay the action and order Crystal Shores "to submit to the

9

individual appraisal process required under the express terms of the policy."

On December 1, 2022, Crystal Shores filed a response in opposition to Great American's motion to compel an appraisal of the dispute over the amount of the loss incurred by Crystal Shores. In that response, Crystal Shores asserted that Great American had denied payment on its submitted hurricane-damage insurance claim based on "certain exclusions and 'coverage issues,'" not based on a disagreement over the amount of the loss. In support of that argument, Crystal Shores cited -- and attached to its response -- an October 27, 2020, letter Great American had sent to Crystal Shores. Relying on that letter and on Rogers v. State Farm Fire & Casualty Co., 984 So. 2d 382, 392 (Ala. 2007), which Crystal Shores argued stood for the proposition that "'[q]uestions of coverage and liability should be decided only by the courts, not [by] appraisers,'" Crystal Shores contended that its action should not be stayed for purposes of an appraisal because there were questions about coverage, not just the amount of the loss, at issue in the case.

On December 19, 2022, Great American filed a "Supplemental Submission in Support of its Motion to Dismiss, or in the Alternative to

Stay and Compel Compliance with the Appraisal Procedure Specified in the Policy." In that supplemental submission, Great American argued that the coverage-issues dispute between Crystal Shores and Great American had concerned Crystal Shores' claim for damage stemming from Hurricane Sally and that "[t]he Hurricane Sally Claim has been resolved between Great American and Crystal Shores. The Hurricane Sally Claim is also not part of Crystal Shores' Third-Party allegations against Great American." The supplemental submission further asserted that "[t]here are no coverage issues related to the Unit 606 Claim [the bathtub-overflow claim] under Great American's policy, and the Hurricane Sally Claim was resolved in Great American's December 16, 2020, correspondence disclaiming coverage." In support of those contentions, Great American attached to its supplemental submission a December 16, 2020, letter from Great American adjuster Mark Erlandson, which stated that Great American had "completed its investigation into this claim involving wind and water damage to the Crystal Shores Condominium building that occurred during Hurricane Sally" and that "the facts of the loss and the Policy terms … require us to decline coverage for a portion of the claim as submitted." Additionally,

Great American attached to its supplemental submission an affidavit from Erlandson stating that "Great American has not received any correspondence from Crystal Shores or its attorneys disputing Great American's handling of the [Hurricane Sally] claim itself." Because, according to Great American, none of Crystal Shores' claims against it involved insurance-coverage issues, Great American argued that its motion to compel an appraisal of the dispute over the amount of the loss incurred by Crystal Shores should be granted.

On January 6, 2023, the circuit court entered an order denying Great American's motion to dismiss or to stay the action and compel compliance with the insurance policy's appraisal procedure. The order did not specify the circuit court's reasons for its decision. On February 2, 2023, Great American appealed. On April 14, 2023, Great American filed in the circuit court a motion to stay the proceedings in the circuit court pending resolution of its appeal; the circuit court did not rule on that motion.

On May 11, 2023, Crystal Shores filed in this Court a motion to dismiss Great American's appeal for lack of jurisdiction because, Crystal Shores argued, the appeal stemmed from a nonfinal interlocutory order.

Specifically, Crystal Shores contended that Great American's appeal was not cognizable under Rule 4(d), Ala. R. App. P., because the appeal did not stem from "[a]n order granting or denying a motion to compel arbitration." In support of its argument, Crystal Shores attached to its motion a copy of this Court's order dismissing an appeal by Baldwin Mutual Insurance Company ("Baldwin Mutual") in Baldwin Mutual Insurance Co. v. Dixon (No. 1100162, Jan. 12, 2011), in which the Court stated that "the appeal is dismissed as from a non-appealable order." In order to provide context for that order, Crystal Shores also attached to its motion to dismiss a copy of Baldwin Mutual's appellate brief in Dixon, seeking to demonstrate that Baldwin Mutual had, like Great American in this case, appealed from a circuit court's order denying a motion to dismiss and demand for an appraisal.

On May 15, 2023, the Supreme Court Clerk's Office issued a show-cause order requiring Great American to respond to Crystal Shores' motion to dismiss the appeal. On the same date, Great American filed with this Court an emergency motion to stay the proceedings in the circuit court pending resolution of the appeal. On May 19, 2023, Great American filed with this Court its response to the show-cause order.

13

Great American contended that "courts across the country have recognized [that], '[u]nder the Federal Arbitration Act, [9 U.S.C. § 1 et seq.], appraisal provisions are regularly treated as arbitration provisions by the courts and enforced in the same manner.' Walker v. Allstate Prop. & Cas. Ins. Co., No. 2:19-CV-701-RDP, … n.3 (N.D. Ala. Mar. 10, 2020)." Great American further asserted that the order issued in Dixon "contains no stated rationale and has no precedential value." In support of that assertion, Great American attached to its response a copy of Baldwin Mutual's response to a show-cause order from this Court requiring it to explain why its appeal should not be dismissed in which Baldwin Mutual had argued that "in Alabama appraisal under an insurance policy is considered analogous to demands for arbitration and this Court has applied the same standards to both." In contrast, Great American contended, it had cited multiple cases from other jurisdictions showing that appraisal clauses are treated as arbitration clauses.

On May 23, 2023, Crystal Shores filed a reply to Great American's response to the show-cause order. In its reply, Crystal Shores argued that the case relied upon by Great American, Walker v. Allstate Property & Casualty Insurance Co., No. 2:19-CV-701-RDP, Mar. 10, 2020 (N.D. Ala.

14

2020) (not reported in Federal Supplement), "has no applicability to the present issue before this Court because the <u>Walker</u> Court "did not analyze whether an appellate court has jurisdiction pursuant to Rule 4(d)[, Ala. R. App. P.,] for purposes of reviewing the denial of an interlocutory non-final order such as the one presently before this Court." Crystal Shores further argued that if Great American wanted to "avail itself of the procedural mechanism within Rule 4(d) of the Alabama Rules of Appellate Procedure to appeal the denial of a motion to compel arbitration, Great American simply could have added an arbitration clause to its contract of insurance."

On May 26, 2023, this Court entered an order granting Great American's emergency motion to stay the proceedings in the circuit court pending resolution of the appeal and placing Crystal Shores' motion to dismiss the appeal under submission.

## II. Analysis

As the rendition of facts details, the threshold issue in this case is whether this Court has jurisdiction to consider Great American's appeal of the circuit court's order denying its motion to dismiss or to stay the action and compel compliance with the insurance policy's appraisal

15

procedure. It is undisputed that Great American's only asserted basis for jurisdiction is Rule 4(d), Ala. R. App. P., which provides:

> "An order granting or denying <u>a motion to compel arbitration</u> is appealable as a matter of right, and any appeal from such an order must be taken within 42 days (6 weeks) of the date of the entry of the order, or within the time allowed by an extension pursuant to Rule 77(d), Alabama Rules of Civil Procedure."

(Emphasis added.) Jurisdiction under Rule 4(d) necessarily requires Great American to contend that the appraisal clause is, in fact, an arbitration clause. Great American does so by quoting snippets from a few federal cases that have examined whether appraisal clauses in insurance contracts should be treated as arbitration clauses. For example, in <u>Milligan v. CCC Information Services Inc.</u>, 920 F.3d 146, 152 (2d Cir. 2019), the United States Court of Appeals for the Second Circuit concluded:

> "The appraisal process here constitutes arbitration for purposes of the FAA. The appraisal provision identifies a category of disputes (disagreements between the parties over 'the amount of loss'), provides for submission of those disputes to specified third parties (namely, two appraisers and the jointly-selected umpire), and makes the resolution by those third parties of the dispute binding (by stating that '[a]n

16

award in writing of any two <u>will determine</u> the amount of the loss').")[3]

However, in citing <u>Milligan</u> and other federal cases, Great American has neglected to mention that a threshold issue faced by federal courts in determining whether a certain procedure qualifies as "arbitration" under the FAA is whether federal or state law defines that

---

[3]Great American also emphasizes the statement from a footnote in <u>Walker v. Allstate Property & Casualty Insurance Co.</u>, No. 2:19-CV-701-RDP, Mar. 10, 2020, n.3 (N.D. Ala. 2020) (not reported in Federal Supplement), that, "[u]nder the Federal Arbitration Act ('FAA'), appraisal provisions are regularly treated as arbitration provisions by the courts and enforced in the same manner." The <u>Walker</u> Court's sole citation in support of that assertion was <u>200 Leslie Condominium Association v. QBE Insurance Corp.</u>, No. 10-61984-CIV, June 21, 2011 (S.D. Fla. 2011) (not reported in Federal Supplement), in which the <u>Leslie Condominium Association</u> court stated that "'[a]ppraisal provisions in insurance policies ... have generally been treated as arbitration provisions.'" But in making that statement, the Federal District Court for the Southern District of Florida was discussing Florida law and quoting from <u>United States Fidelity & Guaranty Co. v. Romay</u>, 744 So. 2d 467, 469 (Fla. Dist. Ct. App. 1999). In doing so, the federal district court apparently overlooked the Florida Supreme Court's decision in <u>Allstate Insurance Co. v. Suarez</u>, 833 So. 2d 762, 765 (Fla. 2002), in which it concluded that "an unambiguous provision for appraisal" could not be "construed as an agreement to arbitrate the underlying dispute." See also <u>Nationwide Mut. Fire Insurance Co. v. Schweitzer</u>, 872 So. 2d 278, 279 (Fla. Dist. Ct. App. 2004) ("<u>Suarez</u> plainly held that an appraisal provision is not an agreement to arbitrate. It follows from <u>Suarez</u> that an order granting or denying an appraisal is not appealable as an order involving entitlement to arbitration."). Thus, <u>Walker</u>'s statement was not supported by ample authorities.

17

term in the statute. That issue arises because, as the <u>Milligan</u> court itself observed, "[t]he FAA does not define the term 'arbitration.' " <u>Milligan</u>, 920 F.3d at 151. See also <u>Evanston Ins. Co. v. Cogswell Props., LLC</u>, 683 F.3d 684, 693 (6th Cir. 2012) (same); <u>Fit Tech, Inc. v. Bally Total Fitness Holding Corp.</u>, 374 F.3d 1, 6 (1st Cir. 2004) ("The [FAA] itself does not define 'arbitration.' "); <u>Harrison v. Nissan Motor Corp. in U.S.A.</u>, 111 F.3d 343, 350 (3d Cir. 1997) ("We note first that the FAA does not define the term 'arbitration,' and both courts and commentators have struggled to do so."); <u>Martinique Props., LLC v. Certain Underwriters at Lloyd's London</u>, 567 F. Supp. 3d 1099, 1104 (D. Neb. 2021) (observing that "the law does not define what constitutes an arbitration," and that "the United States Courts of Appeals are split on whether to use state law or federal common law to define this term" and citing several cases to illustrate that point). A commentator summarized current federal-court treatment on the issue:

> "The United States Supreme Court has yet to issue an opinion on whether state or federal law should define arbitration. Circuit unity is highly improbable until the court grants certiorari and issues an opinion. Currently, the Fifth and the Ninth Circuits apply state law; the First, Second, Sixth, and Tenth Circuits apply federal common law."

Emily H. Slay, Evanston Insurance Co. v. Cogswell Properties: Which Definition of "Arbitration" Should Control?, 38 Am. J. Trial Advoc. 377, 383 (2014) (footnotes omitted). See also Positano Place at Naples I Condo. Ass'n v. Empire Indem. Ins. Co., 84 F.4th 1241, 1255 (11th Cir. 2023) ("We have not decided the question of whether an appellate court looks to state or federal law in determining whether an appraisal process falls within the definition of 'arbitration' for purposes of the FAA, nor has the Supreme Court directly addressed the question.").

A. Defining FAA "Arbitration" Using Federal Law

The federal circuits that have concluded that federal law should determine the definition of the term "arbitration" in the FAA have done so under the rationale that, as the Sixth Circuit Court of Appeals stated in Evanston Insurance Company, it would be "'counter-intuitive to look to state law to define a term in a federal statute on a subject as to which Congress has declared the need for national uniformity.'" 683 F.3d at 693 (quoting Portland Gen. Elec. Co. v. U.S. Bank Tr. Nat'l Ass'n, 218 F.3d 1085, 1091 (9th Cir. 2000) (Tashima & Lay, JJ., concurring)).

Cases seeking to describe a federal-law definition of "arbitration"

provide various formulations. According to the Eleventh Circuit Court of

Appeals,

> "[o]ne widely-followed opinion asks whether the parties have agreed to submit a dispute to a third party for a decision. <u>AMF Inc. v. Brunswick Corp.</u>, 621 F. Supp. 456, 460 (E.D.N.Y. 1985) (Weinstein, J.). Other authority considers how closely the procedure chosen resembles 'classic arbitration' and whether enforcing it serves the intuited purposes of Congress. <u>Fit Tech v. Bally Total Fitness</u>, 374 F.3d 1, 6-7 (1st Cir. 2004); <u>Salt Lake Tribune Publ'g Co. v. Mgmt. Planning Inc.</u>, 390 F.3d 684, 689-90 (10th Cir. 2004). These differing verbal formulations do not constitute a real disagreement, because submitting a dispute to a third party for a binding decision is quintessential 'classic arbitration.' <u>See</u> <u>Salt Lake Tribune</u>, 390 F.3d at 689 ('classic arbitration' is characterized by 'empower[ing] a third party to render a decision settling [the] dispute'). Thus, when there is a dispute about whether any particular dispute resolution method chosen in a contract is FAA arbitration, we will look for the 'common incidents' of 'classic arbitration,' including (i) an independent adjudicator, (ii) who applies substantive legal standards (<u>i.e.</u> the parties' agreement and background contract law), (iii) considers evidence and argument (however formally or informally) from each party, and (iv) renders a decision that purports to resolve the rights and duties of the parties, typically by awarding damages or equitable relief. <u>See</u> <u>Fit Tech</u>, 374 F.3d at 7. The presence or absence of any one of these circumstances will not always be determinative, and parties have great flexibility under the FAA to select pre-packaged dispute resolution procedures, or to craft their own."

<u>Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.</u>, 524 F.3d 1235, 1239

(11th Cir. 2008).

Although Great American fails to expressly state that it believes federal law should govern the definition of the term "arbitration" in the FAA, Great American's argument that the appraisal clause is an arbitration clause generally appears to agree with the foregoing understanding of a federal definition of "arbitration." Great American asserts that the question to be answered is: "[D]oes the [appraisal clause] say that the parties will submit disputes of the type at issue to binding resolution by third parties?" Great American's brief at 18. Great American contends that the appraisal clause fulfills those elements of arbitration because the appraisal clause provided that Crystal Shores and Great American "would submit valuations disputes under the Policy to binding resolution by third parties" and the appraisal clause "contains the elements of an arbitration agreement: the use of third-parties (appraisers and an umpire) to review the evidence and resolve the dispute by issuing a binding, final resolution of the dispute." Id. at 19, 20.

One flaw in Great American's argument is that the procedure outlined in the appraisal clause does not, in fact, fulfill multiple elements of so-called "classic arbitration" highlighted in Advanced Bodycare Solutions. First, although the appraisal clause provides for third parties

to determine the amount of the loss, there is nothing in the appraisal clause that dictates that the appraisers or the umpire must use some specific standard in determining the value of the loss or that they must consider evidence and arguments from the parties in doing so. That is unsurprising given that insurance appraisals are often contrasted with the formalities usually inherent in arbitration proceedings.

> "The similarities and differences between the processes of appraisal and arbitration are not well defined, although it is generally conceded that appraisal is designed to be less formal than arbitration. [See, e.g., Allstate Ins. Co. v. Martinez, 790 So. 2d 1151, 1152 (Fla. Dist. Ct. App. 2001) (holding that the appraisal process did not have to conform to rules of arbitration requiring attorney participation, court reporter transcriptions, and quasi-judicial hearing); Hirt v. Hervey, 118 Ariz. 543, 545, 578 P.2d 624, 626 (Ct. App. 1978) ('While appraisals are generally less formal than arbitrations, both provide a contractual method for settling questions in a less complicated and expensive manner than through court adjudication.'); In re Delmar Box Co., 309 N.Y. 60, 62-66, 127 N.E.2d 808, 810-13 (1955) (noting that appraisal should not be given the same recognition as arbitration because it is limited to specific issues, conducted in a less formal manner, is not bound by strict judicial investigation, and requires no hearing).] …
>
> "….
>
> "… In arbitration, parties want to present witnesses and evidence, and to cross-examine opponents' witnesses. [Andrew L. Pickens, Appraisement: An Old But Effective Form of ADR for Contract Liabilities, 60 Tex. Bar J. 18, 20 (1997) (quoting City of Omaha v. Omaha Water Co., 218 U.S.

22

180, 194 (1910)) (discussing differences between appraisal and arbitration).] Appraisal, on the other hand, has few clear rules. <u>If the appraisers do not find it necessary, there may not be a formal hearing, presentation of witnesses, or taking of evidence</u>. [See Richard C. Bennett, Appraisal, in 2 <u>Insuring Real Property</u> § 30.03[6] (Matthew Bender 2005).] <u>Appraisers 'act independently and apply their own skill and knowledge in reaching their conclusions.'</u> [<u>Budget Rent-A-Car of Washington-Oregon, Inc. v. Todd Inv. Co.</u>, 43 Or. App. 519, 523, 603 P.2d 1199, 1201 (1979).] <u>Appraisers can generally make their own decisions concerning what they wish to see and how they see it</u>."

Timothy P. Law & Jillian L. Starinovich, <u>What Is It Worth? A Critical Analysis of Insurance Appraisal</u>, 13 Conn. Ins. L.J. 291, 297-99 (2007) (emphasis added). Those same differences in procedural formality were highlighted by the Mississippi Supreme Court in <u>Hartford Fire Insurance Co. v. Jones</u>, 235 Miss. 37, 41-42, 108 So. 2d 571, 572 (1959):

"'Appraisement, in particular, is perhaps most often confused with arbitration. While some of the rules of law that apply to arbitration apply in the same manner to appraisement, and the terms have at times been used interchangeably, there is a plain distinction between them. In the proper sense of the term, arbitration presupposes the existence of a dispute or controversy to be tried and determined in a quasi judicial manner, whereas appraisement is an agreed method of ascertaining value or amount of damage, stipulated in advance, generally as a mere auxiliary or incident feature of a contract, with the object of preventing future disputes, rather than of settling present ones. Liability is not fixed by means of an appraisal; there is only a finding of value, price, or amount of loss or damage. The investigation of arbitrators is in the nature of a judicial inquiry and involves, ordinarily,

23

a hearing and all that is thereby implied. Appraisers, on the other hand, where it is not otherwise provided by the agreement, are generally expected to act upon their own knowledge and investigation, without notice of hearings, are not required to hear evidence or to receive the statements of the parties, and are allowed a wide discretion as to the mode of procedure and sources of information.'"

(Quoting 3 Am. Jur. <u>Arbitration and Award</u> § 3 at 830-31.) See, e.g., <u>City of Omaha v. Omaha Water Co.</u>, 218 U.S. 180, 198 (1910) (observing that "in an appraisement … the strict rules relating to arbitration and awards do not apply, and the appraisers were not rigidly required to confine themselves either to matters within their own knowledge, or those submitted to them formally in the presence of the parties; but might reject, if they saw fit, evidence so submitted, and inform themselves from any other source, as experts who were at last to act upon their own judgment"); <u>Fit Tech</u>, 374 F.3d at 7 (holding that "common incidents" of classic arbitration include "an independent adjudicator, substantive standards..., and an opportunity for each side to present its case"); <u>Allstate Ins. Co. v. Suarez</u>, 833 So. 2d 762, 765 (Fla. 2002) (overruling a Florida District Court of Appeals' decision because it "went beyond the plain meaning of the appraisal clause when it considered that the appraisers would have to 'exercise ... quasi-judicial authority to resolve

24

the dispute'" (quoting <u>Florida Farm Bureau Cas. Ins. Co. v. Sheaffer</u>, 687 So. 2d 1331, 1334 (Fla. Dist. Ct. App. 1997))); <u>Black's Law Dictionary</u> 126 (11th ed. 2019) (defining "appraisement" as "[a]n alternative-dispute-resolution method used for resolving the amount or extent of liability on a contract when the issue of liability itself is not in dispute. … Unlike arbitration, appraisement is not a quasi-judicial proceeding but instead an informal determination of the amount owed on a contract.").

Second, authorities that rely upon the idea of "classic arbitration" indicate that arbitration resolves the entire dispute between the parties, whereas appraisal does not. See, e.g., <u>Rastelli Bros. v. Netherlands Ins. Co.</u>, 68 F. Supp. 2d 440, 446 (D.N.J. 1999) ("'An agreement for arbitration, as that term is now generally used, encompasses the disposition of the entire controversy between the parties upon which award a judgment may be entered, whereas an agreement for an appraisal extends merely to the resolution of the specific issues of cash value and the amount of loss, all other issues being reserved for settlement by negotiation, or litigated in an ordinary action upon the policy.'" (quoting George J. Couch, Ronald A. Anderson, and Mark S. Rhodes, <u>Couch on Insurance</u> § 50:5 (2d ed. 1982))); 46A C.J.S. <u>Insurance</u>

§ 1900 (2018) ("Appraisal establishes only the amount of a loss and not liability for the loss under the insurance contract, whereas arbitration is a quasi-judicial proceeding that ordinarily will decide the entire controversy."). Indeed, Great American steadfastly insists that "[t]he only dispute remaining [between the parties] is whether Crystal Shores is entitled to additional payments due to its assertion of a higher damage valuation" and that this is one reason the appraisal clause is, in fact, an arbitration clause. Great American's brief at 1.

However, Crystal Shores strenuously contends that "coverage and causation issues clearly exist" apart from the valuation dispute that would be settled by the appraisal clause. Crystal Shores' brief at 14. Specifically, Crystal Shores argues that, from the time it originally filed its insurance claims, Great American has disputed whether the insurance policy covers damage stemming from Hurricane Sally and "whether the water damage to the condominium and units was caused by the tub overflow, Hurricane Sally[,] or a combination of both." Id. at 14-15.

Great American counters by arguing that

"because the Complaint limits the claims against Great American to the bathtub overflow claim, and because it is

> undisputed that Great American has accepted <u>coverage</u> on the bathtub overflow claim (and has actually already paid over $1 million), the only remaining dispute at issue in this lawsuit is one that the parties agreed should be resolved only through the appraisal procedure: the proper amount of payment due under the bathtub overflow claim."

Great American's reply brief at 2.

Great American's argument does not comport, however, with the allegations stated in Crystal Shores' third-party complaint. As we related in the rendition of the facts, in its complaint Crystal Shores expressly stated that it had "timely and properly reported its Hurricane Sally claim" to all of the third-party defendants, including Great American. Crystal Shores then alleged in part that Great American had "refused to compensate [Crystal Shores] for services allegedly rendered by Servpro to mitigate and remediate damage caused by … Hurricane Sally …." Crystal Shores further alleged in part that, even though it had timely and properly reported the damage "sustained as a result of Hurricane Sally," "third-party Defendants RSUI, Landmark, <u>Great American</u> and [fictitiously named defendants] have failed to promptly and/or properly investigate [Crystal Shores'] losses" and "Defendants RSUI, Landmark, <u>Great American</u> and [fictitiously named defendants] have further <u>failed</u> <u>to timely and/or properly compensate Crystal Shores for losses sustained</u>

as a result of Hurricane Sally ...." (Emphasis added.) The specific counts of the third-party complaint also included allegations against Great American with respect to damage Crystal Shores allegedly had sustained because of Hurricane Sally. Crystal Shores' bad-faith claims in part included the allegation that Great American had "intentionally and/or recklessly failed to timely and/or properly investigate and/or pay [Crystal Shores'] claim for damages sustained as a result of the storm event ...." Crystal Shores' breach-of-contract claims in part included the allegation that Great American had breached "the terms and conditions of the insurance policies ... by failing to timely and properly investigate and pay [Crystal Shores] for losses sustained as a result of the storm event ...."

In short, viewing the allegations in the complaint in the light most favorable to Crystal Shores -- as we are supposed to do in reviewing a motion to dismiss[4] -- Crystal Shores plainly leveled allegations against Great American pertaining to damage caused by Hurricane Sally even though Great American insists that "Crystal Shores' third-party

_____

[4]See, e.g., Morton v. Prescott, 564 So. 2d 913, 916 (Ala. 1990) ("In considering a motion to dismiss, a court construes the allegations of the complaint in a light most favorable to the plaintiff, with all doubts and allegations resolved in his favor.").

complaint did not name Great American in the allegations regarding the Hurricane Sally loss and did not accuse Great American of any wrong with regard to that claim." Great American's brief at 11. In other words, Crystal Shores has alleged that it was entitled to coverage that Great American did not provide under the insurance policy with respect to damage allegedly caused by Hurricane Sally. Crystal Shores also asserts that Great American's denial of further payments on Crystal Shores' bathtub-overflow claim is tied to Great American's insistence that at least some of the remediation performed by Servpro was for damage caused by Hurricane Sally, compensation for which, Great American contends, it is not responsible under the insurance policy. Thus, outstanding coverage issues exist that would not be resolved by the appraisal procedure, and so the appraisal would not resolve the entire dispute between the parties. A procedure that does not fully and finally settle the dispute between the parties does not comport with the definition of "arbitration" under federal law.

In short, the appraisal clause does not require the appraisers or the umpire to consider evidence and arguments from the parties, the appraisal clause does not require the appraisers or the umpire to base

their valuation on a substantive legal standard, and submission of the valuation issue to the appraisal process would not settle the entire dispute between Crystal Shores and Great American. Thus, the appraisal clause fails to meet most of the elements of "classic arbitration" described in cases that have chosen to define the term "arbitration" in the FAA using federal law. We must conclude, therefore, that the appraisal clause is not an arbitration clause under the FAA according to that standard -- the only standard argued by Great American.

B. Defining FAA "Arbitration" Using State Law

The federal circuits that have concluded that state law should determine the definition of the term "arbitration" in the FAA have done so under the rationale that as long as a state's laws do not interfere with the goals of the FAA, state law should apply because the FAA only preempts state laws to the extent that they stand as an obstacle to the accomplishment of the purposes and objectives of the FAA. See, e.g., Portland Gen. Elec., 218 F.3d at 1089 (applying Oregon law); Hartford Lloyd's Ins. Co. v. Teachworth, 898 F.2d 1058, 1062-63 (5th Cir. 1990) (applying Texas law); Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1582 (9th Cir.1987) (applying California law). Cf. Volt Info. Scis., Inc. v.

Board of Trs. of Stanford Univ., 489 U.S. 468, 478 (1989) (holding that the FAA preempts state laws to the extent that they "would undermine the goals and policies of the FAA").

Even if Great American had argued that the definition of the term "arbitration" in the FAA should be determined by Alabama law, the argument would have fared no better. With respect to Alabama law, the parties bicker about what can be read into our order dismissing Baldwin Mutual's appeal in Dixon, which stated that "the appeal is dismissed as from a non-appealable order." Crystal Shores is correct that Baldwin Mutual contended that its appeal from a circuit court's order denying its motion to dismiss and demand for appraisal was proper under Rule 4(d), Ala. R. App. P. Conversely, Great American is correct that Baldwin Mutual only argued that insurance appraisals are "considered analogous to demands for arbitration," not specifically that an appraisal clause is an arbitration clause, and Baldwin Mutual did not cite the federal authorities Great American has cited to us. Ultimately, Dixon is not decisive for either party in this case because our order in Dixon did not expressly address the issue presented here.

But our order in <u>Dixon</u> is revealing for the authorities Baldwin Mutual did cite and those it could not. Baldwin Mutual had noted in its response to the show-cause order that, in determining whether a party has waived its right to invoke an appraisal clause, this Court has applied the test it commonly uses to determine whether a party has waived its right to invoke an arbitration clause. See <u>Rogers</u>, 984 So. 2d at 386 ("Although this Court has never ruled on what standard should be applied to determine whether there has been a waiver of the right to invoke an appraisal clause in an insurance policy, the former Court of Appeals previously indicated that the same standard applies to both appraisal and arbitration clauses."). However, despite the fact that this Court had employed the same test for waiver with respect to both types of clauses, Baldwin Mutual merely contended that an appraisal clause was "analogous to" an arbitration clause, not that it <u>was</u> an arbitration clause. Why?

One problem was that the <u>Rogers</u> Court itself went on to distinguish appraisal clauses from arbitration clauses by hearkening back to this Court's decision in <u>Casualty Indemnity Exchange v. Yother</u>, 439 So. 2d 77 (Ala. 1983). In <u>Yother</u>, the Court declared: "We agree that an appraisal

32

is distinguishable from arbitration and is not subject to the various procedural requirements imposed upon the arbitration process." Id. at 79. The Yother Court went on to explain:

"Arbitration and appraisal are generally distinguished in the following manner:

"'A distinction is often drawn between an arbitration and a mere appraisal or valuation, or proceeding in the nature of an appraisal, the fundamental difference between the two proceedings being held to lie in the procedure to be followed and the effect of the findings. In other words, the point is made that appraisers, unlike arbitrators, act without hearing or judicial inquiry upon their own knowledge or information acquired independent of the evidence of witnesses; and that the appraisal ordinarily settles only a subsidiary or incidental matter rather than the main controversy as does an arbitration award.'

"6 C.J.S. Arbitration, § 3 (1975)."

Id. at 79-80 (emphasis added). The Rogers Court picked up on and repeated the analysis in Yother:

"In Yother, this Court distinguished arbitration clauses from appraisal clauses in a situation in which the insured contended that it was entitled to the procedural protections applicable to arbitration as set forth in [Ala. Code 1975,] § 6-6-1.[5] The insurer contended that it was subject to the law

_____

[5]Section 6-6-1, Ala. Code 1975, is the first section of the Alabama Arbitration Act, providing: "It is the duty of all courts to encourage the settlement of controversies pending before them by a reference thereto

33

applicable to appraisals and not § 6-6-1. At issue in <u>Yother</u> was the value of a stolen tractor. The Court, quoting <u>Corpus Juris Secundum</u> and <u>American Jurisprudence</u>, noted typical differences between arbitration and appraisal -- arbitration settles an entire controversy, whereas an appraisal resolves a subsidiary issue, such as the valuation of loss. This Court observed:

"'"An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties upon which award a judgment may be entered, whereas an agreement for appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for determination in a plenary action before the court. Furthermore, appraisers are generally expected to act on their own skill and knowledge; they may reach individual conclusions and are required to meet only for the purpose of ironing out differences in the conclusions reached; and they are not obliged to give the rival claimants any formal notice or to hear evidence, but may proceed by ex parte investigation so long as the parties are given opportunity to make statements and explanations with regard to matters in issue."'

"439 So. 2d at 80 (quoting 5 Am. Jur.2d <u>Arbitration and Award</u> § 3 (1962)). However, the Court in <u>Yother</u> found it unnecessary to determine whether the valuation at issue there was the result of an arbitration or an appraisal, because it disposed of the case on the basis of applicable due-process considerations independent of § 6-6-1, Ala. Code 1975. This Court's distinguishing of arbitration and appraisal in <u>Yother</u> is consistent with other jurisdictions. See <u>Merrimack Mut.</u>

---

arbitrators chosen by the parties or their attorneys and, on motion of the parties, must make such order and continue the case for award."

> Fire Ins. Co. v. Batts, 59 S.W.3d 142, 150 (Tenn. Ct. App. 2001) ('Insurance appraisals are generally distinguished from arbitrations.... [A]n arbitration agreement may encompass the entire controversy between parties or it may be tailored to particular legal or factual disputes. In contrast, an appraisal determines only the amount of loss, without resolving issues such as whether the insurer is liable under the policy.'), and Smithson v. United States Fid. & Guar. Co., 186 W. Va. 195, 202, 411 S.E.2d 850, 857 (1991) ('The narrow purpose of an appraisal and the lack of an evidentiary hearing make it a much different procedure from arbitration.')."

984 So. 2d at 388-89. Thus, similar to the United States Supreme Court in City of Omaha, the Florida Supreme Court in Suarez, and the Mississippi Supreme Court in Jones, this Court in both Yother and Rogers emphasized the differences in scope and formality between arbitration and appraisal.

Tellingly, Great American does not discuss the Yother and Rogers Courts' distinctions between appraisal and arbitration. Indeed, Great American fails to cite a single case from our courts indicating that an insurance-appraisal clause is, in fact, an arbitration clause. The dearth of Alabama authority is also telling because insurance-appraisal clauses such as the one at issue in this case have been adjudicated by our courts for a long time. For example, in Headley v. Aetna Insurance Co., 202 Ala. 384, 80 So. 466 (1918), this Court interpreted an insurance-appraisal

35

clause very similar to the one in this case, and it distinguished between a predispute arbitration clause and the appraisal clause at issue:

"A covenant in a contract, whether of insurance or of other matters, to submit every matter of dispute between the parties, growing out of such contract, to arbitration or to a board of appraisers, to the end of defeating the jurisdiction of courts as to the subject-matter, are universally held to be void, as against public policy. There need be no such express intent to so defeat the jurisdiction; if the necessary effect of the covenant will inevitably so operate, it is held to be void because against public policy. Agreements, however, which merely provide a mode or manner for ascertaining the value of property, or the amount of damages, losses, or profits, are valid, and may be made conditions precedent to the right of action to recover damages based on such values, damages, losses, or profits. Western Assur. Co. v. Hall, 112 Ala. 318, 20 South. 447 [(1896)]; Niagara [Fire] Ins. Co. v. Bishop, 154 Ill. 9, 39 N.E. 1102, 45 Am. St. Rep. 105 [(1894)]. The clause of the insurance policy in question falls within the latter class, and is valid and enforceable."

202 Ala. at 385, 80 So. at 467.

That Alabama law would not automatically construe an appraisal clause to be an arbitration clause is unsurprising given that

"[a] trial court may not order arbitration of the issue of arbitrability except upon '"'clea[r] and unmistakabl[e]' evidence"' that the parties agreed to arbitrate that issue. Commercial Credit Corp. v. Leggett, 744 So. 2d 890, 892 (Ala. 1999) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995))."

36

<u>Custom Performance, Inc. v. Dawson</u>, 57 So. 3d 90, 96 (Ala. 2010). The most direct evidence of the parties' intent is the language of the agreement itself. See, e.g., <u>id.</u>; <u>Strickland v. Rahaim</u>, 549 So. 2d 58, 60 (Ala. 1989) ("In order to ascertain the intention of the parties, the clear and plain meaning of the terms of the contract are to be given effect, and the parties are presumed to have intended what the terms clearly state.").

> "When determining how to construe the provisions of an insurance policy, this Court is guided by the following principles:
>
> > "'"When analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them. <u>Western World Ins. Co. v. City of Tuscumbia</u>, 612 So. 2d 1159 (Ala. 1992); <u>St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp.</u>, 584 So. 2d 1316 (Ala. 1991). If, under this standard, they are reasonably certain in their meaning, they are not ambiguous as a matter of law and the rule of construction in favor of the insured does not apply. <u>Bituminous Cas. Corp. v. Harris</u>, 372 So. 2d 342 (Ala. Civ. App. 1979). …"

> > "'B.D.B. v. State Farm Mut. Auto. Ins. Co.,
> > 814 So. 2d 877, 879-80 (Ala. Civ. App. 2001).
> > ...'
>
> "State Farm Mut. Auto. Ins. Co. v. Brown, 26 So. 3d 1167,
> 1169-70 (Ala. 2009)."

Mid-Century Ins. Co. v. Watts, 323 So. 3d 39, 50 (Ala. 2020).

In this case, the clause at issue seeks to settle disputes between Great American and Crystal Shores involving the amount of a loss by using appointed appraisers and an umpire. In other words, the clause seeks to appraise the amount of the loss sustained to the property covered by the insurance policy. The language of the clause reflects that the parties intended the clause to be what it states it is: an appraisal clause. There is no ambiguity in the clause's language that would lead to a conclusion that the parties intended the clause to be anything other than what it states. As Crystal Shores observes, "[h]ad Great American desired to insert an arbitration clause in the insurance contract [it] could have done so ...." Crystal Shores' brief at 33. Instead, the insurance policy contains an appraisal clause.

It seems that Great American's only response to such reasoning is the Milligan court's statement that "the term 'arbitrate' need not appear in the contract in order to invoke the benefits of the FAA." Milligan, 920

F.3d at 151. But the <u>Milligan</u> court's statement was made in the context of concluding that federal common law defines the term "arbitration" in the FAA, a subject we dealt with in Part II.A. of this analysis. Here we address the definition of the term "arbitration" under Alabama law. As we have noted, Alabama cases have consistently drawn distinctions between appraisal and arbitration, Alabama law focuses on whether the parties to the contract intended to arbitrate the dispute at issue based on the language of the contract, and, despite the prolific presence of appraisal clauses such as the one at issue in insurance contracts, our courts have never held that "appraisal" is the same procedure as "arbitration." Therefore, we conclude that under Alabama law an appraisal clause in an insurance contract does not qualify as a clause calling for "arbitration" under the FAA.

### III. Conclusion

Based on the foregoing, we conclude that, regardless of whether federal law or Alabama law controls the definition of the term "arbitration" in the FAA, the appraisal clause at issue in this case does not qualify as a clause calling for "arbitration" under the FAA. Therefore, Great American's motion to compel an appraisal of the loss did not

constitute a motion to compel arbitration. It follows that the circuit court's denial of Great American's motion was not "[a]n order … denying a motion to compel arbitration" under Rule 4(d), Ala. R. App. P. Rule 4(d) is Great American's only claimed basis for jurisdiction to immediately appeal the circuit court's January 6, 2023, order. Accordingly, we dismiss the appeal as one stemming from a nonfinal judgment.

APPEAL DISMISSED.

Wise, Bryan, Sellers, Mendheim, Stewart, and Cook, JJ., concur.

Shaw, J., concurs in the result.

Mitchell, J., concurs in the result, with opinion, which Parker, C.J., joins.

MITCHELL, Justice (concurring in the result).

In my view, the operative question in this appeal is whether an appraisal is an "arbitration" under Rule 4(d), Ala. R. App. P., not whether it is an "arbitration" under the Federal Arbitration Act ("the FAA"), 9 U.S.C. § 1 et seq. That is a question of Alabama law, and I believe our law fully supplies the answer. Accordingly, I would dismiss this appeal on State-law grounds only.

The main opinion focuses on the meaning of "arbitration" under the FAA and discusses the two leading standards applied by federal courts for defining FAA arbitration. But the main opinion does not cite -- and I am not aware of -- any precedent from our Court tying the meaning of "arbitration" under Rule 4(d) to the meaning of "arbitration" under the FAA. Thus, what federal courts have done to interpret the meaning of "arbitration" in the FAA is, at most, persuasive in determining what "arbitration" means in Rule 4(d). West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law."); Ex parte James, 836 So. 2d 813, 834 (Ala. 2002) (Houston, J., concurring specially) ("[T]he Supreme Court of Alabama is the final arbiter of Alabama law."). I see no need to consider federal

authority here because our own precedents have determined that an appraisal does not constitute arbitration. See Rogers v. State Farm Fire & Cas. Co., 984 So. 2d 382, 388-89 (Ala. 2007); Casualty Indem. Exch. v. Yother, 439 So. 2d 77, 79-80 (Ala. 1983); Headley v. Aetna Ins. Co., 202 Ala. 384, 385, 80 So. 466, 467 (1918). For that reason, I would dismiss the appeal based on Alabama law alone.

Parker, C.J., concurs.